# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 8, 2009 Session

## STATE OF TENNESSEE v. CHARLOTTE YVONNE TURNER

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Obion County**
**No. C07-192     William B. Acree, Jr., Judge**

---

**No. W2007-01590-SC-R11-CD - Filed October 15, 2009**

---

We granted permission to appeal in this case to determine whether the police violated the constitutional rights of the defendant, a parolee, when they searched her residence without a warrant but pursuant to a condition of her parole. We adopt the reasoning of the Supreme Court in <u>Samson v. California</u>, 547 U.S. 843 (2006), and hold that parolees who are subject to a warrantless search condition may be searched without reasonable or individualized suspicion. The officers who searched the defendant's residence knew about her parole status, were aware of the warrantless search condition of her parole, and did not conduct the search in an unreasonable manner. Accordingly, the trial court erred in suppressing evidence found during the search of the defendant's residence. The judgment of the Court of Criminal Appeals is reversed, and this matter is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal**
**Appeals Reversed; Remanded**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined. SHARON G. LEE, J., filed a dissenting opinion.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Asst. Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Asst. District Attorney General; for the appellant, State of Tennessee.

James T. Powell, Union City, Tennessee, for the appellee, Charlotte Turner.

## OPINION

### Factual and Procedural Background

The defendant, Charlotte Yvonne Turner ("Defendant"), was convicted in Kentucky in 2002 of felony possession of controlled substance I and wanton endangerment in the first degree. She received a seven-year sentence but was paroled by the Commonwealth of Kentucky in February 2005. Defendant was subsequently permitted to move her residency and, in September 2005, her

parole supervision was transferred to Tennessee, where she came to reside in Obion County. In conjunction with her parole in Tennessee, Defendant signed a standard document in September 2005 in which, among other things, she "agree[d] to a search, without a warrant, of [her] person, vehicle, property, or place of residence by any Probation/Parole Officer or law enforcement, at any time." The conditions of Defendant's parole in both Kentucky and Tennessee also prohibited possession of a weapon, see also Tenn. Code Ann. § 39-17-1307(b)(1)(B) (2006), and required Defendant to obey federal, state, and local laws.

Defendant was indicted in June 2007 in Obion County for being a felon in possession of a handgun. Defendant filed a motion to suppress which the trial court granted after a hearing. The testimony adduced at the hearing includes the following.

In April 2007, Officer Shawn Palmer worked for the Union City Police Department and was assigned to the 27th Judicial District Drug Task Force. Officer Palmer testified that he knew Defendant personally and knew that she was "out on parole in Kentucky for trafficking a controlled substance, crack cocaine, and her parole [had] been transferred to a parole officer here in Tennessee." He also knew she had previously been "convicted of dealing drugs here in Obion County." Officer Palmer stated that he "had been given information that [Defendant] was still involved in selling crack cocaine." Thus, on April 3, when Officer Palmer saw Defendant driving without wearing a seatbelt, he pulled her over.[1] In response to a question by the prosecutor, Officer Palmer admitted that the stop was "pretextual" in the sense that "sometimes [he] write[s] for a seatbelt; sometimes we don't."

During the stop, Defendant identified her passenger as her friend, Torrie Smith. Officer Palmer and Officer O'Dell ran license and warrant checks on both Defendant and Ms. Smith. Based on information known to Officer O'Dell and learned from the dispatcher, Ms. Smith was placed under arrest for criminal impersonation and was found to have outstanding warrants for probation or parole violation and transporting marijuana.

Officer Palmer contacted Defendant's parole officer by phone to confirm that Defendant was subject to searches. Upon receiving verbal confirmation, he conducted a pat-down search of Defendant which revealed $975 in Defendant's pocket. Officer Palmer testified: "With the information that we were given that she'd been involved in dealing drugs again; the passenger had two warrants out for drug arrests; and the fact that [Defendant] has no form of income whatsoever and I believe a three time convicted [sic] for drug convictions, we seized the money." The officers then told Defendant that they wanted to search her house. Officer Palmer testified that Defendant "said she didn't want to and we told her, fine, we'll just call your parole officer [and] tell her that you're not cooperating." According to Officer Palmer, Defendant then called her parole officer and confirmed that the conditions of her parole included warrantless searches.

---

[1] A driver failing to wear a safety belt while driving a car on a Tennessee highway may be prosecuted for a Class C misdemeanor. See Tenn. Code Ann. § 55-9-603(a), (d)(1) (2008).

The officers agreed to meet Defendant at her residence. They drove there and waited in the front yard for Defendant to arrive. Officer Palmer stated that they waited "a good twenty minutes or so." Defendant arrived in her car and, according to Officer Palmer, "walked up and said, started crying and said, 'I got a gun in the house.'" Defendant then unlocked her door and the officers began their search. They recovered a loaded .38 caliber handgun.

On cross-examination, defense counsel established that Defendant's parole documents from Kentucky stated that she was on parole for possession of a controlled substance, not "trafficking."[2] Officer Palmer admitted that he did not ultimately issue a citation to Defendant for a seatbelt violation. He also admitted that, upon searching Defendant, he did not find any drugs on her person. He nevertheless decided to search Defendant's house based on "[t]he conditions of her parole and the rulings of the United States Supreme Court."

Officer Palmer admitted that Defendant's seatbelt violation was a pretext for his pulling her over and that his real concern was that he suspected "that she'd been selling drugs again." Officer Palmer stated that his suspicion was based on information he had received from one of his "informants."

When asked if Defendant had had an opportunity to refuse to go to her house for the search, Officer Palmer testified, "I told her, I told her if she didn't want to go, fine, I'll call the parole officer." Officer Palmer admitted that, at the time he determined to search Defendant's house, he did not have enough information to get a search warrant. According to Officer Palmer, approximately one hour passed from the time he pulled Defendant over to the time he finished searching her house.

Defendant also testified. She stated that the first thing Officer Palmer said to her when he pulled her over was to get out of the car. He did not say anything about a seatbelt violation. He started searching her when she got out of her car. He also searched her car. He indicated that he was looking for drugs; he did not find any on her person or in her car. She offered no resistance to these searches.

After Officer Palmer finished searching Defendant's car, he told her to drive to her house so he could search her house. According to Defendant, "he told me if I didn't go to my house he was gonna call my PO or he was gonna take me to jail anyway." She stated that the time period between Officer Palmer pulling her over and finishing the search of her house was about two hours. Defendant testified that Officer Palmer never asked to see her driver's license or her vehicle registration, both of which she had with her.

---

[2]The actual Kentucky judgment orders are not in the record. Similarly, although the State filed certain notices reflecting three prior Tennessee felony convictions for the sale of a controlled substance, the judgment orders reflecting those convictions are also not in the record.

On cross-examination, Defendant acknowledged that, while being detained, she called and spoke with her parole officer. Her parole officer read her the parole condition regarding searches; she did not specifically tell Defendant whether or not she had to drive over to her house at Officer Palmer's demand.

After hearing this testimony, the trial court ruled from the bench and granted Defendant's motion to suppress. The trial judge stated that he was "convinced that there was no consent given in this case to search the house, that the defendant felt she had no choice but to allow them into the house or that they would have gone anyway or she would have been taken to jail." The trial court continued: "The search in this case in my opinion was permitted of the defendant, of her person, when she was stopped. I don't see anything unreasonable in that under the existing law. However, to require the defendant to go to another location with no basis whatsoever and detain her for one to two hours, the Court finds that constitutes an harassing, capricious and arbitrary search." The court specifically found no evidence to support "any type of suspicion or reasonable suspicion" in connection with the search of Defendant's home and concluded that the search violated the Fourth Amendment. The Court of Criminal Appeals affirmed the trial court's ruling on the basis that the "application of the reasonable parole condition by the police officers, in this case, became unreasonable as a result of this lengthy seizure of" Defendant, referring to the total time elapsed between the initial traffic stop and the conclusion of the search of Defendant's residence. State v. Turner, No. W2007-01590-CCA-R3-CD, 2008 WL 1891445, at *5 (Tenn. Crim. App. Apr. 29, 2008).

We granted the State's application for permission to appeal in order to address for the first time the recent Supreme Court case dealing with warrantless and suspicionless searches of parolees, Samson v. California, 547 U.S. 843 (2006).

**STANDARD OF REVIEW**

On appeal from a ruling on a motion to suppress, we will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996). The prevailing party in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. The application of the law to the facts, however, is a question of law that this Court reviews de novo. State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

**ANALYSIS**

**I. The Fourth Amendment**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons [and] houses . . . against *unreasonable* searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. amend. IV (emphasis added). Whether or not a particular search is "unreasonable" and therefore in violation

4

of the Fourth Amendment "depends upon all of the circumstances surrounding the search . . . and the nature of the search . . . itself." United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). Upon taking all of the relevant circumstances into account, "the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989) (quoting Delaware v. Prouse, 440 U.S. 648, 654 (1979)).

"The essence of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions by government officials.'" Id. (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)) (quotation corrected). Thus, the basic constitutional rule is that a warrantless search or seizure is presumed unreasonable, and any evidence discovered as a result is subject to suppression. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bridges, 963 S.W.2d 487, 490 (Tenn.1997). This basic rule is subject to "a few specifically established and well-delineated exceptions[,] jealously and carefully drawn." Coolidge, 403 U.S. at 455 (quoting Katz v. United States, 389 U.S. 347, 357 (1967), and Jones v. United States, 357 U.S. 493, 499 (1958)). "These exceptions include searches and seizures conducted incident to a lawful arrest, those yielding contraband in 'plain view,' those in the 'hot pursuit' of a fleeing criminal, those limited to a 'stop and frisk' based on reasonable suspicion of criminal activity, those based on probable cause in the presence of exigent circumstances, and those based on consent." State v. Day, 263 S.W.3d 891, 901 n.9 (Tenn. 2008) (citing State v. Cox, 171 S.W.3d 174, 179 (Tenn. 2005), and State v. Bartram, 925 S.W.2d 227, 230, 230 n.2 (Tenn. 1996)).

## II. Warrantless Searches of Convicted Defendants Serving Sentences May Be Reasonable

The basic rule against warrantless searches is also relaxed if the person being searched has been convicted of a criminal offense and is serving a sentence. The Supreme Court has recognized that a criminal conviction subjects the offender to "a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." Griffin v. Wisconsin, 483 U.S. 868, 874 (1987). An offender's place on this continuum alters what is "reasonable" for purposes of the Fourth Amendment. For instance, incarcerated felons have *no* legitimate expectation of privacy in their prison cells. See Hudson v. Palmer, 468 U.S. 517, 526 (1984) (holding that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and . . . , accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell"); State v. Williams, 690 S.W.2d 517, 524 (Tenn. 1985) (recognizing that "an expectation of privacy is not justified in a jail cell"); State v. Dulsworth, 781 S.W.2d 277, 284 (Tenn. Crim. App. 1989) (recognizing that, under Palmer, a prisoner's expectation of privacy under the Fourth Amendment is severely curtailed).

Probationers[3] rest further along the continuum. Accordingly, probationers' privacy interests under the Fourth Amendment are also reduced, but are not so far diminished as those of incarcerated felons. See United States v. Knights, 534 U.S. 112, 119 (2001). In Knights, the Supreme Court considered the constitutionality of the warrantless search of a probationer's home. The defendant had accepted as a condition of his probation that he would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." Id. at 114. Applying the totality of the circumstances test, of which the defendant's probation search condition was "a salient circumstance," id. at 118, the Court analyzed the reasonableness of the search by balancing "'the degree to which it intrudes upon an individual's privacy [against] the degree to which it is needed for the promotion of legitimate governmental interests.'" Id. at 119 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). The Court specifically determined that the defendant's "status as a probationer subject to a search condition informs both sides of that balance." Id.

In first assessing the degree of intrusion upon a probationer's privacy interest, the Court recognized that

> [i]nherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

Id. (internal quotation marks and citations omitted). The Court concluded that the search condition "would further the two primary goals of probation–rehabilitation and protecting society from future criminal violations." Id. As a result of the search condition, the probationer's reasonable expectation of privacy was "significantly diminished." Id. at 119-20.

Turning to the governmental interest side of the balance, the Court reasoned as follows:

> it must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law. The recidivism rate of probationers is significantly higher than the general crime rate. And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply.

---

[3]A probationer is one who has been found guilty of a crime, upon verdict or plea, but has been released by a court without imprisonment "subject to conditions imposed by the court and subject to the supervision of the probation service." Tenn. Code Ann. § 40-28-102(6) (2006).

Id. (internal quotation marks and citations omitted). The Court recognized that states have a

> dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community.

Id. at 120-21. The Court then concluded that "the balance of these considerations requires *no more than* reasonable suspicion to conduct a search of [the] probationer's house." Id. at 121 (emphasis added).

Because the search at issue in Knights was supported by reasonable suspicion, the search passed Fourth Amendment muster. Id. at 122. Significantly, the Court left open the question "whether the probation condition so diminished, or completely eliminated, [the probationer defendant's] reasonable expectation of privacy . . . that a search by a law enforcement officer *without* any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment." Id. at 120 n.6 (emphasis added).[4] A search unsupported by any individualized suspicion came before the Court in Samson v. California, 547 U.S. 843 (2006).

### III. Parolees: Samson v. California

On the continuum of possible punishments and reductions in freedoms, parolees occupy a place between incarcerated prisoners and probationers. Tennessee's statutory scheme defines parole as "the release of a [previously incarcerated] prisoner to the community . . . prior to the expiration of the prisoner's term subject to conditions . . . ." Tenn. Code Ann. § 40-28-102(5). "Release on parole is a privilege and not a right . . . ." Id. § 40-35-503(b) (2006); see also id. § 40-28-117(a) (2006). Under Tennessee's statutory scheme, persons released outside of prison walls on parole remain in the legal custody of the warden (or relevant penal supervisor) and are subject to all of the provisions upon which their parole is conditioned. Id. § 40-28-117(a); Doyle v. Hampton, 340 S.W.2d 891, 893 (Tenn. 1960). Parolees remain under the confinement of their sentences while on parole. Doyle, 340 S.W.2d at 893.

Knights did not address the question whether parolees have any reasonable expectation of privacy under the Fourth Amendment; that question was recently addressed by the Supreme Court in Samson.

Donald Curtis Samson was a California parolee. As a condition of his release on parole under a California statute, Samson had agreed in writing "to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant

---

[4]Similarly, State v. Davis, 191 S.W.3d 118, 121-22 (Tenn. Crim. App. 2006), involved an almost identical Tennessee condition of probation. The Court of Criminal Appeals declined to address whether a warrantless search of the probationer was per se reasonable because it found the search to be supported by reasonable suspicion. Our resolution of the instant case also does not require us to resolve this issue as to probationers.

and with or without cause." Samson, 547 U.S. at 846 (quoting Cal. Penal Code Ann. § 3067(a) (West 2000)).

San Bruno Police Officer Alex Rohleder knew that Samson was on parole and believed Samson had an outstanding at-large warrant. Upon seeing Samson out walking one day, Officer Rohleder stopped him and inquired about the warrant. Samson replied that there was no outstanding warrant and that he was in good standing with his parole officer. Officer Rohleder confirmed this information by radio. Officer Rohleder nevertheless conducted a search of Samson, "based solely on [Samson's] status as a parolee," id. at 846-47, and found methamphetamine on his person. After he was charged with possession, Samson filed a motion to suppress, which the trial court denied. The Supreme Court upheld the search against a Fourth Amendment challenge. Id. at 847.

Returning to the balancing test it had used in Knights,[5] the Court first reasoned that "parolees have fewer expectations of privacy than probationers, because *parole is more akin to imprisonment than probation is to imprisonment*." Id. at 850 (emphasis added). Second, Samson was "unambiguously" aware of the search condition of his parole. Id. at 852 (quoting Knights, 534 U.S. at 119). Thus, "[e]xamining the totality of the circumstances pertaining to [Samson's] status as a parolee, an established variation on imprisonment, including the plain terms of the parole search condition," the Court concluded that Samson "did not have an expectation of privacy that society would recognize as legitimate." Id. (internal quotation marks and citation omitted).

On the other side of the scale, the Court reasoned that

> [t]he State's interests, by contrast, are substantial. This Court has repeatedly acknowledged that a State has an "overwhelming interest" in supervising parolees because "parolees . . . are more likely to commit future criminal offenses." Similarly, this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.

Id. at 853 (quoting Pa. Bd. of Prob. and Parole v. Scott, 524 U.S. 357, 365 (1998)). The Court recognized that "[t]he California Legislature has concluded that, given the number of inmates the State paroles and its high recidivism rate, a requirement that searches be based on individualized suspicion would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders," and agreed that "[t]his conclusion makes eminent sense." Id. at 854. The Court reasoned that "[i]mposing a reasonable suspicion requirement . . . would give parolees greater opportunity to anticipate searches and conceal criminality." Id. Hence, the search of parolee Samson passed Fourth Amendment muster even though it was not supported by any reasonable or individualized suspicion. Id. at 857.

---

[5]The Samson Court specifically declined to analyze the search under a consent theory. 547 U.S. at 852 n.3.

8

The Court's holding that a parolee could be searched without any particularized suspicion has resulted in some criticism. See, e.g., 5 LaFave, Search and Seizure, § 10.10 at 432-82 (4th ed. 2004) and Supp. 2008-09 at 27-44. In our view, however, Samson does not present a significant departure from the Court's earlier Fourth Amendment jurisprudence.[6] The Skinner Court reiterated in 1989 that, although "some quantum of individualized suspicion" was *usually* necessary for a search to be reasonable, 489 U.S. at 624 (emphasis added), the rule was not a hard and fast one:

> a showing of individualized suspicion is *not* a constitutional floor, below which a search must be presumed unreasonable. In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.

Id. (citation omitted) (emphasis added); see also Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989) (emphasizing "the longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance"). The majority in Samson simply crafted a narrow exception to the usual rule: an exception which is hardly misguided given the minimal privacy interests retained by parolees and the government's "overwhelming interest" in ensuring that a parolee complies with the conditions of her parole. As noted by the Colorado Supreme Court even before Samson was decided, "[r]equiring individualized suspicion would eliminate a powerful deterrent to parole violations and, consequently, would place in jeopardy the State's overwhelming interest in ensuring that a parolee complies with the conditions of his parole." People v. McCullough, 6 P.3d 774, 781 (Colo. 2000) (En Banc).

## IV. Tennessee Constitution

Article I, section 7, of Tennessee's Constitution provides similarly to the Fourth Amendment that "the people shall be secure in their persons [and] houses . . . from *unreasonable* searches and seizures." Tenn. Const. art. I, § 7 (emphasis added). While this Court has not previously addressed the scope of a parolee's constitutional privacy interest, we have previously recognized that Tennessee's constitutional provision against unreasonable searches and seizures is "'identical in intent and purpose with the Fourth Amendment.'" State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). And, while this Court has also recognized its freedom "to interpret the provisions of our state constitution to afford greater

---

[6]Our research indicates that few of our sister state high courts have undertaken an analysis of Samson in the context of a challenge to a suspicionless search of a parolee. Similarly to our holding today, the Illinois Supreme Court has adopted and applied Samson to a parolee subject to a search condition providing that the parolee "shall consent to a search of [his] person, property, or residence under [his] control." People v. Wilson, 885 N.E.2d 1033, 1035 (Ill. 2008). The parolee was convicted of a drug offense after a suspicionless search of his bedroom. The Illinois Supreme Court first noted that "the search in question was nonconsensual" in spite of the wording of the parole condition. Id. at 1036. The Court specifically rejected the parolee's contention that Samson was distinguishable because his condition of parole was worded differently than Samson's. Id. at 1042.

protection than the federal constitution," State v. Cox, 171 S.W.3d 174, 183 (Tenn. 2005), we are persuaded that the Samson analysis strikes the correct balance between the severely diminished privacy interests of a convicted felon serving the remainder of his or her sentence on parole release in the community, and society's interests in both reintegrating that felon and protecting itself against recidivism.

The award of parole to an incarcerated prisoner is a privilege and not a right. Tenn. Code Ann. § 40-28-117(a). It is a privilege the State of Tennessee may accord to persons incarcerated for committing serious felonies in spite of worrisome statistics of recidivism. According to the Tennessee Department of Correction Research Brief Update titled "TDOC Release Trends and Failure Rates [tracking] Felon Releases 1999-2003," a publication compiled by the Tennessee Department of Correction Division of Policy, Planning, & Research and dated April 27, 2005,[7] felons released to parole in 2000 had a recidivism rate of 50% within the first three years of their release. Close and careful supervision of Tennessee parolees is appropriate. See Samson, 547 U.S. at 854 (acknowledging "the grave safety concerns that attend recidivism"). The constitutional parameters of what is "reasonable" for parolees must take this very real danger of recidivism into account.

Although a parolee's constitutional protections against unreasonable searches may not be extinguished as completely as those of incarcerated prisoners,[8] parole status is a "powerful circumstance" much more akin to incarceration than probation or freedom[9] in determining the reasonableness of a search. See United States ex rel. Randazzo v. Follette, 282 F. Supp. 10, 13 (S.D.N.Y. 1968); see also United States v. Crawford, 372 F.3d 1048, 1077 (9th Cir. 2004) (En Banc) (Kleinfeld, J., concurring) (explaining that parolees, in contrast to probationers, "have been sentenced to prison for felonies and released before the end of their prison terms" and are "deemed to have acted more harmfully than anyone except those felons not released on parole"). A prisoner who is accorded the privilege of parole must agree to be bound by all of the conditions imposed upon his or her release. A parole condition requiring that the parolee submit to warrantless searches is reasonable in light of the parolee's significantly diminished privacy interests; the goals sought to be attained by early release; and society's legitimate interest in protecting itself against recidivism. We therefore adopt the reasoning of Samson and hold that the Tennessee Constitution permits a parolee to be searched without any reasonable or individualized suspicion where the parolee has agreed to

---

[7]See http://www.tennessee.gov/correction/pdf/Recidivism%20Brief%20Update.pdf

[8]Some courts construing Samson have concluded that "[t]he Supreme Court, for all intents and purposes, has decided that a parolee who has signed a search condition [providing for warrantless searches by law enforcement officers at any time] has no Fourth Amendment rights, subject only to a protection from arbitrary, capricious or harassing searches." United States v. Widener, No. 3:08-CR-01, 2008 WL 4831344, at *3 (E.D. Tenn. Nov. 4, 2008). See also, e.g., State v. Bennett, 200 P.3d 455, 462 (Kan. 2009); Segundo v. State, 270 S.W.3d 79, 98 (Tex. Crim. App. 2008). We need not reach this issue to decide this case.

[9]"Parole . . . is nothing more than a conditional suspension of sentence . . . . The sentence of the man does not expire because of the parole, nor during the pendency of the parole." Doyle, 340 S.W.2d at 893.

warrantless searches by law enforcement officers.[10]

## V. Limits on Warrantless, Suspicionless Searches of Parolees

Samson generated a dissent which expressed concerns about "a regime of suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards, by law enforcement personnel who have no special interest in the welfare of the parolee or probationer." Samson, 547 U.S. at 857 (Stevens, J., dissenting). The majority responded by observing that "[t]he concern that California's suspicionless search system gives officers unbridled discretion to conduct searches, thereby inflicting dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society, is belied by California's prohibition on 'arbitrary, capricious or harassing' searches." Samson, 547 U.S. at 856 (citing People v. Reyes, 968 P.2d 445, 450, 451 (Cal. 1998); People v. Bravo, 738 P.2d 336, 342 (1987); Cal. Penal Code Ann. § 3067(d) (West 2000)).

While the terms "arbitrary," "capricious," and "harassing" are not easily defined, the California Supreme Court considers (1) that "a parole search could become constitutionally 'unreasonable' if made too often, or at an unreasonable hour, or if unreasonably prolonged or for other reasons establishing arbitrary or oppressive conduct by the searching officer," Reyes, 968 P.2d at 451 (quoting People v. Clower, 16 Cal. App. 4th 1737, 1741 (1993)); (2) that it is "arbitrary and capricious when the motivation for the search is unrelated to rehabilitative, reformative or legitimate law enforcement purposes, or when the search is motivated by personal animosity toward the parolee," id. (citing In re Anthony S., 4 Cal. App. 4th 1000, 1004 (1992)); and (3) that an "unrestricted search of a probationer or parolee by law enforcement officers at their whim or caprice is a form of harassment," id. (citing People v. Bremmer, 30 Cal. App. 3d 1058, 1062 (1973)). See also People v. Smith, 92 Cal. Rptr. 3d 106, 112 (Cal. Ct. App. 2009) (recognizing that "[w]hether a [parole] search is arbitrary, capricious, or harassing turns on its purpose"); McCullough, 6 P.3d at 782 (observing that examples of an abusive search include "searches conducted at an unreasonable hour, searches that are unreasonably prolonged, or frequent and repeated searches that are intended only to harass"). A suspicionless search of a parolee would also be constitutionally suspect if the law enforcement officer conducted it without knowing that the person searched was a parolee subject to warrantless and suspicionless searches. See Samson, 547 U.S. at 856 n.5.

While we agree that these are appropriate factors to consider when reviewing whether a warrantless and suspicionless search of a parolee is unreasonable and therefore unconstitutional, we also recognize that a suspicionless search could be characterized as "arbitrary." See Black's Law Dictionary 112 (8th ed. 2004) ("1. Depending on individual discretion . . . ."). A search of this type is not necessarily unreasonable, however. Therefore, the totality of the circumstances surrounding a warrantless, suspicionless search of a parolee must be examined to determine whether the search is constitutionally unreasonable. For example, a pattern of repetitive searches while the parolee is at work or asleep would be unreasonable. Searches intended to cause the parolee some harm would

---

[10]Importantly, such searches may be undertaken only if the searching officer has prior knowledge of the parolee's status as subject to such searches. See Samson, 547 U.S. at 856 n.5.

be unreasonable. A search conducted out of personal animosity would be unreasonable. Indeed, there may be other situations where a warrantless, suspicionless search of a parolee is unreasonable. A suspicionless search of a parolee subject to a warrantless search condition, and which is conducted out of valid law enforcement concerns, is not unreasonable.[11]

## VI. The Search of Defendant's Residence

The search provision at issue in Samson was pursuant to a specific California statute. See Samson, 547 U.S. at 846. Tennessee does not have a similar statute; rather, our statutory scheme allows the Board of Probation and Parole to "impose [on parolees] any conditions and limitations that [it] deems necessary." Tenn. Code Ann. § 40-28-116(b) (2006). One of the conditions imposed on Defendant was the warrantless search provision, which is a standard condition.[12] It is uncontroverted that Defendant agreed in writing to the warrantless search provision. Moreover, Officer Palmer and Defendant both verified this condition of Defendant's parole with her parole officer immediately prior to the search of her residence. We must now review the totality of the circumstances, of which Defendant's status as a parolee and her agreement to the warrantless search condition are salient circumstances, and determine whether the search of Defendant's residence[13] was reasonable.

The trial court determined that it was not, after finding only that "[t]he total process took anywhere between one and two hours" and that Defendant's home was located in "another part of Union City" from where the traffic stop took place. The Court of Criminal Appeals agreed, holding that "[t]he application of the reasonable parole condition by the police officers, in this case, became unreasonable as a result of this lengthy seizure of [Defendant]." Turner, 2008 WL 1891445, at *5.

---

[11]Because we recognize that a suspicionless search of a parolee may be constitutionally unreasonable, we disagree with the dissent that the rule we adopt today "gives police officers complete and unfettered power to detain and search a citizen."

[12]We are cognizant that the search provision at issue in Samson subjected California parolees to searches "with or without a search warrant and *with or without cause*." Samson, 547 U.S. at 846 (emphasis added). Some courts have intimated that "without cause" is the equivalent of "without suspicion." See, e.g., United States v. Freeman, 479 F.3d 743, 748 (10th Cir. 2007); State v. Ochoa, 765 N.W.2d 607, __, 2009 WL 398390, at *3 (Iowa Ct. App. Feb. 19, 2009); see also Samson, 547 U.S. at 852 (describing the California parole search condition as requiring parolees "to submit to suspicionless searches"). The search provision to which Defendant agreed does not contain the language "without cause" or "without suspicion." We do not find this distinction to be dispositive. See Wilson, 885 N.E.2d at 1042. Indeed, Defendant herself does not argue this distinction. The point of the standard search condition used by Tennessee's Board of Probation and Parole is to alert parolees that law enforcement officers will be able to search them and their premises without the usual necessity of first obtaining a judge's or magistrate's permission. Parolees are thus informed prior to their release that their constitutional rights regarding searches and seizures have been severely reduced. Nevertheless, the Board of Probation and Parole may wish to consider revising its standard conditions to reflect explicitly that parolees may be searched without either a warrant or any particularized suspicion.

[13]Defendant does not contest the on-scene search of her self or her automobile. Only the search of Defendant's residence is before us in this appeal.

12

We respectfully disagree with the courts below that the search of Defendant's residence was unreasonable. Based on information he had received from an informant, Officer Palmer was concerned that Defendant was engaged in drug dealing. He knew she had been previously convicted for a drug offense in Tennessee. He knew her parole status and confirmed that she was thereby subject to warrantless searches. Upon observing her commit a traffic infraction, which constituted a Class C misdemeanor and thus violated the terms of her parole, he pulled her over and conducted a search of her person and vehicle. He found no drugs but did find a large sum of cash on Defendant's person.[14] The presence of this large sum of money together with the absence of any drugs on Defendant's person or in her car gave Officer Palmer some grounds to be concerned that Defendant might have recently made a drug sale and might have more drugs at her residence.[15]

Officer Palmer's decision to search Defendant's residence was not unreasonable when examined under the totality of the circumstances. There is no proof in the record that Officer Palmer acted for any reason other than the furtherance of legitimate law enforcement concerns. Defendant had been convicted of drug offenses in two states. Officer Palmer had information from an informant that she was currently involved in selling crack cocaine. He verified Defendant's parole status and the warrantless search condition before he proceeded to search her residence. Neither the search of Defendant's vehicle nor that of her residence was unreasonably lengthy. That the total time of Defendant's detention may have been at most two hours, and included a short trip by Defendant in her own vehicle, did not so prolong the detention as to make the search unreasonable.

We hold that the warrantless search of Defendant's residence, made pursuant to a written condition of her parole, was reasonable under the Fourth Amendment of the United States Constitution and article 1, section 7, of the Tennessee Constitution, even if made without any reasonable, individualized, or particularized suspicion.

## CONCLUSION

We hold that the warrantless search of Defendant's residence, made pursuant to her status as a parolee and a written condition of her parole of which she and the searching officer were aware, was reasonable under the Fourth Amendment of the United States Constitution and article I, section 7, of the Tennessee Constitution, even if not supported by reasonable suspicion. Accordingly, the trial court erred in granting Defendant's motion to suppress and the Court of Criminal Appeals erred

---

[14]Officer Palmer also found Defendant in the company of a woman who had an outstanding warrant for a probation or parole violation. Defendant's association with this woman may have constituted a violation of the conditions of her Kentucky parole, which prohibited Defendant from associating "with a convicted felon except for legitimate purposes." The conditions of Defendant's Tennessee parole included in the record do not contain a similar prohibition.

[15]The dissent implies that Officer Palmer's sole justification for searching Defendant's residence was his understanding of the warrantless search provision of her parole and rulings by the United States Supreme Court. In fact, Officer Palmer also relied on his knowledge of Defendant's criminal history, information that she was currently dealing drugs, her possession of a large sum of cash, and her traveling with a person who was subject to an outstanding warrant for a drug offense.

13

in affirming the trial court. We therefore reverse the judgment of the Court of Criminal Appeals and remand this matter to the trial court for further proceedings consistent with this opinion.

Defendant having been found indigent, the costs of this cause are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE