IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 4, 2017 Session

## STATE OF TENNESSEE v. ANGELA CARRIE PAYTON HAMM and DAVID LEE HAMM

**Appeal from the Circuit Court for Obion County**
**No. CC-16-CR-15   Jeff Parham, Judge**

_____

### No. W2016-01282-CCA-R3-CD

_____

The State appeals the trial court's order granting the Defendants' motions to suppress evidence seized as a result of a warrantless search of their house.  The trial court found that, although Defendant Angela Hamm was on probation at the time of the search and was subject to warrantless searches as a condition of her probation, the search was invalid because the police officers did not have reasonable suspicion to justify the search.  On appeal, the State contends that (1) the search was supported by reasonable suspicion; (2) the search was reasonable based upon the totality of the circumstances; (3) Angela Hamm consented to the search by agreeing to the warrantless search probation condition; and (4) the warrant search was valid as to Defendant David Lee Hamm under the doctrine of common authority.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court.   JOHN EVERETT WILLIAMS, J., filed a separate concurring opinion.  ALAN E. GLENN, J., filed a separate dissenting opinion.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Tommy A. Thomas, District Attorney General; and James Cannon, Assistant District Attorney General, for the appellant, State of Tennessee.

Charles S. Kelly, Sr., Dyersburg, Tennessee, for the appellee, Angela Carrie Payton Hamm.

James T. Powell, Union City, Tennessee, for the appellee, David Lee Hamm.

**OPINION**

In November 2015, police officers conducted a warrantless search of the Defendants' home and seized various drugs and drug paraphernalia. As a result, the Defendants were arrested and subsequently indicted for possession of more than 0.5 grams of a substance containing methamphetamine with the intent to sell or deliver, possession of alprazolam with the intent to sell or deliver, possession of morphine with the intent to sell or deliver, possession of amphetamine with the intent to sell or deliver, possession of clonazepam with the intent to sell or deliver, possession of hydrocodone with the intent to sell or deliver, and possession of drug paraphernalia.

The Defendants each filed a motion to suppress, challenging the warrantless search of their home. Angela Hamm argued that, although she was on probation at the time of the search, the police officers did not have reasonable suspicion to conduct the search. David Hamm argued that neither he nor Angela Hamm consented to the search and that he retained a reasonable expectation of privacy in the home despite Angela Hamm's status as a probationer. The State did not file a written response.

During an evidentiary hearing, the State presented the testimony of Officer James Hall, who was a member of the Obion County Sheriff's Department Drug Task Force in November 2015. Officer Hall testified that, on November 16, 2015, he served a drug-related arrest warrant on Lindsey Gream from Dyer County, Tennessee. Officer Hall stated that Gream thanked him for taking her to the hospital and keeping her alive and mentioned "heavy players in Obion County" whom the officers should watch. When Officer Hall asked Gream who the people were, Gream replied, "Well, I'm not going to say specifically who exactly. I will let you know of the location, and they're in Glass," a community in Obion County. Officer Hall asked Gream whether the person was David Hamm, and Gream nodded her head and smiled. Officer Hall said Gream told him that "they" had been trafficking ice methamphetamine to Obion County from "across the river" on a frequent basis. Gream did not indicate how she knew this information. Officer Hall stated Gream did not provide "concrete" information regarding how often the trips across the river had occurred. Rather, she stated that "they" made the trips often and had "re-upped" or had purchased more drugs a few days prior to her conversation with Officer Hall. Officer Hall shared this information with other members of the drug task force, including Officer Ben Yates.

On cross-examination, Officer Hall testified that he did not attempt to secure a search warrant based on Gream's information because he did not believe that the information was sufficient to establish probable cause for a search warrant. Rather, he believed that, based on this information, the officers had reasonable suspicion to conduct a "probation search" on Angela Hamm. Officer Hall stated that, according to one of the

rules in Angela Hamm's probation order, she had agreed "to a search, without a warrant, of her person, vehicle, property, place of residence by any probation/parole officer or law enforcement officer at any time." Officer Hall testified that he also believed that reasonable suspicion was necessary to conduct the search because Angela Hamm's probation order did not include the "without reasonable suspicion" language that some probation orders did.[1] Officer Hall did not believe that he had the probation order in his possession prior to conducting the search but said officers confirmed through the State probation office that Angela Hamm had signed the order.

Officer Hall acknowledged that, while Angela Hamm was on probation at the time of the search, David Hamm was not on probation and had not signed any forms agreeing to have his residence searched. Officer Hall also stated that David Hamm owned the residence but that Angela Hamm was either married to David Hamm or was in a relationship with him and had been living in the residence for "quite some time" prior to the search.

Officer Hall testified that Gream was a defendant in one of the cases which he had investigated in Dyer County and was a "known methamphetamine user." He said Gream was neither a citizen informant nor a "paid informant." When defense counsel asked Officer Hall how he classified Gream as credible and reliable, Officer Hall replied,

> In my experience in working narcotics, it is common for some users—dealers, users to throw bones at somebody else to keep their attention off of them. And whether this is the case with her, I don't think so. She was already caught. And what she got in Dyer County, there was no deal made, no money passed, no signing of her being on some sort of program to work with the [drug task force]. She just gave me that information.

Officer Hall acknowledged that Gream provided the information while a drug charge was pending against her.

---

[1] Defense counsel sought to question Officer Hall about a Westate Corrections Network Community Corrections Rules form signed by defendants who receive community corrections supervision through Westate Corrections Network. The State objected, arguing that the form and its contents were irrelevant because Angela Hamm never signed the form and was not subject to the rules. The trial court sustained the State's objection but allowed defense counsel to submit the form as an offer of proof. One of the rules on the form provides:

> Offenders will allow the Case Officer to visit his/her home, employment site, or elsewhere at any time during the day or night and shall carry out all instructions given by the Case Officer, whether oral or in writing. Offenders will allow law enforcement to conduct a search of offender and all areas of the house upon request to control contraband or locate missing or stolen property.

Officer Hall acknowledged that Gream never told him that she had ever been inside of the Defendants' home or that she had ever purchased drugs from the Defendants. Office Hall did not know whether Gream was relaying information that someone else told her, and he did not corroborate any of the information that she provided.

Officer Hall testified that neither of the Defendants was home when the officers searched the house and that David Hamm never consented to the search. Officer Hall believed that Clifton Hamm allowed the officers inside of the residence. When defense counsel asked whether Clifton Hamm opened the door and allowed the officers inside the house, Officer Hall replied, "We asked . . . [where] the bedroom was, and I believe he pointed us in the direction and said that's the bedroom." Officer Hall acknowledged that the officers first learned that the Defendants slept in the same bedroom after the officers entered the house.

Based on the information that he received from Gream, Officer Hall and three other officers went to the Defendants' house. The officers knocked on the front and side doors, but no one answered. The officers asked a boy, who was approximately thirteen or fourteen years old, and who was outside the home, whether either of the Defendants was there. The teenager replied that the Defendants had just left to visit the parole or probation officer. The teenager stated that Clifton Hamm and others were in the shop behind the house. Officer Yates and Officer Kelly walked to the shop located approximately twenty to thirty yards behind the house where they met Clifton Hamm, Vernon Harrell, and Mark Payton. Clifton Hamm lived at the home, Payton was Angela Hamm's ex-husband, and Harrell was a friend. Officer Hall stated that Officer Yates told him that when he approached the shop, the men were watching the security system camera and that Clifton Hamm turned off the security camera when Officer Yates walked into the shop. Officer Hall said Officer Yates and Officer Kelly remained at the shop for approximately five minutes. The officers reported that Clifton Hamm told them where the Defendants' bedroom was located.

Officer Hall testified that the officers opened the side door and entered the residence. They searched the entire house, except a little girl's bedroom. While searching the Defendants' bedroom, Officer Kelly found pills in the nightstand on Angela Hamm's side of the bed. Inside a closet shared by the Defendants, Officer Hall found a magnetic eye glass case that contained weighing scales and two bags of ice methamphetamine. Two glass pipes were also located in the Defendants' bedroom. No evidence was found in the remainder of the house.

Officer Ben Yates of the Union City Police Department testified that, on November 17, 2015, while he was a member of the drug task force, he participated in a

- 4 -

"probation search" at Angela Hamm's residence. Officer Yates stated that on November 16, he received information from Officer Hall about a conversation that Officer Hall had with Gream. Officer Yates said that, prior to his conversation with Officer Hall, a reliable informant told Officer Yates that the Defendants were "doing it big in Glass." Officer Yates explained that the informant had provided information in the past that led to the seizure of narcotics in numerous cases. The informant had not observed the drugs transactions but said that he "has friends that purchase methamphetamine." Officer Yates said that he did not believe that he had sufficient evidence to procure a search warrant because the informant had not been in the residence or seen the drug transactions.

Officer Yates also testified that, prior to receiving the information about Gream from Officer Hall, an informant who was cooperating with the drug task force went to Clifton Hamm's residence to purchase methamphetamine from Clifton Hamm but was unable to do so. Officer Yates said that, at that time, he was unaware that Clifton Hamm was living with the Defendants.

Officer Yates testified that he and other officers confirmed with the probation office that Angela Hamm was on probation as a result of a conviction for manufacturing a controlled substance. The officers also confirmed that the probation order provided that Angela Hamm was subject to a warrantless search. Officer Yates could not recall whether he obtained a copy of Angela Hamm's probation order before going to the Defendants' home. He said he may have spoken to Angela Hamm's probation officer before going to the home and obtained a copy of the probation order later.

Officer Yates testified that when he, Officer Hall, Agent Andrew Kelly, and Investigator David Crocker arrived at the Defendants' house, Officer Yates came in to contact with Clifton Hamm's teenaged son, who was standing at the side door near a detached garage. When Officer Yates asked the teenager whether the Defendants were home, the teenager stated that the Defendants had just left for the probation office in Union City, Tennessee. Officer Yates asked if anyone else was there, and the teenager replied that everyone else was in the shed.

Officer Yates stated that he and other officers walked behind the house to a detached shop and stopped Harrell as he was leaving the shop. Harrell said he was a visitor and did not live at the residence. Officer Yates said he and Officer Hall entered the shop, and Officer Yates saw Clifton Hamm and Payton holding pool sticks and watching a television that depicted video from four security cameras set up around the property. When Officer Yates entered the shop and asked the men how they were doing, Clifton Hamm quickly turned off the television. Officer Yates asked Clifton Hamm where the Defendants were, and Clifton Hamm told him that they had just left to go to Union City. When Officer Yates asked Clifton Hamm why he was acting nervous and

why he had turned off the television, Clifton Hamm denied that the television was on. Officer Yates stated that, at that time, he did not know where Clifton Hamm was residing, but that he later learned that Clifton Hamm was living at the Defendants' home.

Officer Yates returned to the Defendants' home where he saw Clifton Hamm's son standing at the door with another officer. Officer Yates asked him whether he lived at the home. The teenager confirmed that he, Clifton Hamm, and the Defendants lived at the home. Officer Yates asked the teenager which bedroom belonged to the Defendants, and the teenager stated that their bedroom was located in the back of the house on the right. All of the evidence seized during the search was located in the Defendants' bedroom.

On cross-examination, Officer Yates acknowledged that David Hamm never consented to the search and that, to his knowledge, David Hamm was not on probation at the time of the search. Officer Yates did not know who owned the Defendants' house.

Officer Yates acknowledged that, although he received information from a reliable informant who had previously provided information that led to convictions, he did not believe that the information provided by the informant regarding the Defendants was sufficient to establish probable cause because the informant had not been inside the Defendants' home and had not observed illegal activity. Rather, the informant was providing secondhand information. Defense counsel asked, "So, what we have here is a lot of people telling other people stuff, and that's how that information came to be; would you say that's pretty fair?" Officer Yates responded, "That's pretty fair."

Defense counsel for David Hamm presented the testimony of Evelyn Stigler, Angela Hamm's probation officer. Stigler testified that she had been supervising Angela Hamm since November 8, 2013, and that Angela Hamm signed a form agreeing to a warrantless search as a condition of probation. Stigler said that to her knowledge, David Hamm was not on probation and had not signed a form agreeing to a search of his person or home. She also said that she had never spoken to David Hamm or informed him that he was subject to a lesser expectation of privacy. Stigler stated that Angela Hamm's name was Angela Payton when she signed the probation order, and that it appeared she had married since signing the order.

Following the suppression hearing, the trial court entered an order granting the Defendants' motion to suppress. The trial court found that, although Officer Hall received a tip of some "heavy players" in the Glass community of Obion County, the person "never mentioned a name or how she knew this information." The trial court noted that when Officer Hall suggested the name of David Hamm, the person "winked and smiled" but did not mention Angela Hamm. The trial court found that, while Officer Yates testified that he received information from a reliable informant about people in

Glass "doing it big," the informant was not identified and no evidence was presented establishing the informant's reliability. The trial court also found that "[t]he informant's information was second-hand information from another informant who had attempted unsuccessfully to purchase drugs from another resident (Clifton Hamm) at the location." The trial court concluded that the evidence did not establish "articulable facts to support the reasonable suspicion of the officer to justify a search pursuant to the probation order."

The State represented to the trial court that it was unable to proceed with the prosecution as a result of the order suppressing the evidence. Accordingly, the trial court granted the Defendants' motions to suppress and dismissed the indictment. It is from this order that the State now timely appeals.

## ANALYSIS

On appeal, the State contends that the warrantless search of the Defendants' home was constitutional because it was supported by reasonable suspicion and authorized as a condition of Angela Hamm's probation. The State asserts that, even if the search was not supported by reasonable suspicion, the search was reasonable based upon the totality of the circumstances. Next, the State contends that Angela Hamm consented to the search by agreeing to be subject to warrantless searches as a condition of her probation. Finally, the State maintains that the warrantless search was valid as to David Hamm under the doctrine of common authority.

A trial court's factual determination in a suppression hearing will be upheld on appeal unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions regarding the credibility of witnesses, the weight or value of the evidence, and determinations regarding conflicts in the evidence are matters entrusted to the trial judge as trier of fact. State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010). "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Williamson, 368 S.W.3d 468, 473 (Tenn. 2012) (quoting Odom, 928 S.W.2d at 23). The trial court's application of the law to the facts is reviewed de novo. State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for individuals against unreasonable searches and seizures. State v. Day, 263 S.W.3d 891, 900-901 (Tenn. 2008); see State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002) (recognizing that Tennessee's constitutional provision against unreasonable searches and seizures is "identical in intent and purpose with the Fourth Amendment") (quoting Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968)). "[A] warrantless search or seizure is presumed unreasonable, and evidence

discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The general prohibition against warrantless searches is "relaxed if the person being searched has been convicted of a criminal offense and is serving a sentence." State v. Turner, 297 S.W.3d 155, 161 (Tenn. 2009). A defendant who has been convicted of a criminal offense is subject to "a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." Griffin v. Wisconsin, 483 U.S. 868, 874 (1987). "An offender's place on this continuum alters what is 'reasonable' for purposes of the Fourth Amendment." Turner, 297 S.W.3d at 161. The least protected in this continuum are incarcerated defendants who do not have an expectation of privacy in their prison cells. See Hudson v. Palmer, 468 U.S. 517, 526 (1984); Turner, 297 S.W.3d at 161. Because probationers fall further along the continuum, their privacy interests under the Fourth Amendment are reduced but are not as diminished as the privacy interests of prisoners. Turner, 297 S.W.3d at 161.

In United States v. Knights, the United States Supreme Court applied the totality of the circumstances test in determining the constitutionality of the warrantless search of a probationer's home. 534 U.S. 112, 118 (2001). The defendant accepted as a condition of his probation that he would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." Id. at 114. In applying the totality of the circumstances test, the Court characterized the defendant's probation search condition as a "salient circumstance" and analyzed the reasonableness of the search by balancing "'the degree to which it intrudes upon an individual's privacy [against] the degree to which it is needed for the promotion of legitimate governmental interests.'" Id. at 118-19 (quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). The Court concluded that the defendant's "status as a probationer subject to a search condition informs both sides of that balance." Id.

The Court examined the degree of intrusion upon a probationer's privacy interest and determined that

> [i]nherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

Id. at 119 (internal quotation marks and citations omitted).  The Court determined that the search condition "would further the two primary goals of probation—rehabilitation and protecting society from future criminal violations" and that the defendant's reasonable expectation of privacy was "significantly diminished" as a result of the search condition. Id. at 119-20.

> In examining the governmental interest, the Court recognized that

> it must be remembered that the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law.  The recidivism rate of probationers is significantly higher than the general crime rate.  And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply.

Id. at 120 (internal quotation marks and citations omitted).  The Court also recognized that states have a dual concern with a probationer.  Id.  The Court explained that "[o]n the one hand is the hope that [the probationer] will successfully complete probation and be integrated back into the community.  On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community."  Id. at 120-21.

The Court concluded that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of [the] probationer's house."  Id. at 121 (emphasis added).  The Court noted that "[t]he degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable."  Id. (citation omitted).  The Court recognized that, although the Fourth Amendment ordinarily requires probable cause, "a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  Id. (citation omitted).  The Court determined that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."  Id.  The Court noted that the same circumstances upon which the Court relied in determining that "reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary."  Id. at 121-22 (citing Illinois v. McArthur, 531 U.S. 326, 330

(2001) (noting that general or individual circumstances, including "diminished expectations of privacy," may justify an exception to the warrant requirement)).

The Court held that the warrantless search of the defendant, which was supported by reasonable suspicion and authorized by a condition of his probation, was reasonable under the Fourth Amendment. Id. at 122. The Court left open the question of "whether the probation condition so diminished, or completely eliminated, [the probationer's] reasonable expectation of privacy . . . that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment." Id. at 120 n.6.

This court first addressed the issue of probation searches in State v. Davis, 191 S.W.3d 118 (Tenn. Crim. App. 2006). The defendant in Davis appealed the revocation of his probation for marijuana and methamphetamine offenses stemming from his violation of a condition of his probation in which he agreed "to a search, without a warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time." 191 S.W.3d at 119. The defendant's probation officer and two law enforcement officers requested permission to search the defendant's residence following numerous complaints of traffic in and out of the home and surveillance which revealed that people known to be involved in the manufacture of methamphetamine were entering the home. Id. The defendant refused to allow the officers to search his home, and the defendant's probation was revoked as a result. Id.

On appeal, this court applied the analysis in Knights and concluded that the search was permitted because: (1) the warrantless search provision was reasonably related as a condition of the [defendant's] probation; and (2) the attempted warrantless search of the [defendant's] residence was supported by reasonable suspicion." Id. at 121-22. Accordingly, the defendant's refusal to submit to the search constituted a violation of a condition of his probation. Id. at 122.

**I. Reasonable Suspicion.** The State contends that, like the search in Knights and the attempted search in Davis, the search of the Defendants' home was supported by reasonable suspicion. Reasonable suspicion requires "a lower quantum of proof than probable cause." State v. Pulley, 863 S.W.2d 29, 31 (Tenn. 1993). The Tennessee Supreme Court has recognized that

> "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can

arise from information that is less reliable than that required to show probable cause."

Id. at 32 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).  In evaluating whether a police officer has a reasonable suspicion, supported by specific and articulable facts to believe a crime, a court must consider the totality of the circumstances.  State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000).  "Those circumstances include the objective observations of the police officer, information obtained from other officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders."  State v. Day, 263 S.W.3d 891, 903 (Tenn. 2008).  Additionally, the court "must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him."  State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)).

The evidence presented at the suppression hearing established that Officer Hall received information from Gream, a known methamphetamine user, as he was serving her with an arrest warrant.  She mentioned "heavy players" in the Glass community in Obion County but declined to identify anyone.  When Officer Hall mentioned David Hamm, Gream smiled and nodded her head.  Gream told Officer Hall that "they" had been trafficking ice methamphetamine to Obion County from "across the river" on a frequent basis and had purchased more drugs within the past few days.  Officer Hall did not testify who "they" were, and the State did not ask Officer Hall to clarify the identities of the referenced persons.  Regardless of the reliability of the information, none of Gream's information implicated Angela Hamm in any illegal activity.

The only information linking Angela Hamm to any illegal activity is the conclusory statement from the confidential informant that David and Angela Hamm were "doing it big in Glass." The informant had not observed the drug transactions and provided secondary information from "friends [who] purchase methamphetamine."  No evidence was presented at the suppression hearing to establish that the informant was able to clarify how the Defendants were "doing it big," from whom his friends had purchased drugs, or where the drugs transactions occurred.  This conclusory statement fails to establish reasonable suspicion that Angela Hamm, the probationer subject to the warrantless search provision, had engaged or was engaging in legal activity justifying the warrantless search of her home.

Likewise, the officers' attempted controlled purchase of methamphetamine from Clifton Hamm at the Defendants' residence failed, and the officers were unable to establish through an independent investigation that any illegal activity was occurring in the Defendant's house or that Angela Hamm was involved.  No explanation of their failure to purchase drugs was offered at the suppression hearing.  If anything, the attempt

- 11 -

at corroboration tended to disprove the allegation that David or Angela Hamm was engaged in the sale of methamphetamine. Furthermore, Angela Hamm's association with those who may have been engaged in illegal drug-related activity was neither illegal nor a violation of any conditions of her probation.

The State also relies upon the officers' interaction with Clifton Hamm in the shop behind the Defendants' house to establish reasonable suspicion. However, we note that the presence of security cameras around the property where Angela Hamm lived as observed by the officers was not unlawful. While Clifton Hamm falsely denied watching the video feed of the cameras around the property and turning off the television once the officers entered the shop, his untruthfulness did not implicate Angela Hamm. Moreover, the officers continued to the Defendants' backyard into an outbuilding, with the knowledge that the Defendants' were not at home.

We conclude that the information possessed by the officers at the time of the search was insufficient to establish reasonable suspicion that Angela Hamm was engaged in illegal drug-related activity at the home.

**II.   Totality of the Circumstances.**   The State also asserts that reasonable suspicion to support the probation search was not required and that the search of the Defendants' house was reasonable based upon the totality of the circumstances. While neither the United States Supreme Court nor the Tennessee Supreme Court have squarely addressed whether something less than reasonable suspicion would permit searches of probationers, this court has previously held that, "[w]hen a person has signed a probation agreement providing written consent for a warrantless search of the person's residence, such a search may be conducted if reasonable suspicion for the search exists." State v. Tracy Lynn Carman-Thacker, No. M2014-01859-CCA-R3-CD, 2015 WL 5240209, at *5 (Tenn. Crim. App. Sept. 8, 2015) (citing United States v. Knights, 534 U.S. 112 (2001), and State v. Davis, 191 S.W.3d 118 (Tenn. Crim. App. 2006)) (no perm. app. filed); State v. Janet Michelle Stanfield, Tony Alan Winsett, and Justin Bradley Stanfield, No. W2015-02503-CCA-R3-CD, 2017 WL 1205952 (Tenn. Crim. App. Mar. 31, 2017), perm. app. granted (Tenn. July 19, 2017). "When determining whether an officer had reasonable suspicion, a court must consider the totality of the circumstances, as well as the rational inferences and deductions that a trained officer may draw from the facts known by the officer." State v. Robert Lee Hammonds, No. M2005-01352-CCA-R3-CD, 2006 WL 3431923, at *11 (Tenn. Crim. App. Nov. 29, 2006) (citing State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992)).

Applying the above authority, we conclude that there was no reasonable suspicion to support the search in this case. The record simply does not show that, at the time the officers searched the house, they had reasonable suspicion that Hamm was engaged or

- 12 -

was engaging in criminal activity. To be clear, the officers admitted that they received vague information that the Hamms may be engaged in drug activity. The officers attempted to buy drugs from the Hamm house but were unable to do so. After their unsuccessful attempt, the officers went to Hamm's house again, and she was not there. They continued to the backyard area of Hamm's house to an outbuilding, where they encountered other individuals who were not engaged in criminal activity. Nevertheless, they continued to search Hamm's house. Under the totality of the circumstances approach, the officers' subsequent search of Hamm's house was not supported by reasonable suspicion; and therefore, did not comport with Constitutional limits. See Knights, 534 U.S. at 114; Tessier, 814 F.3d at 433; Tracy Lynn Carman-Thacker, 2015 WL 5240209, at *2; State v. Janet Michelle Stanfield, Tony Alan Winsett, and Justin Bradley Stanfield, 2017 WL 1205952, at *9.

We are compelled to note the State's reliance upon Tessier, 814 F.3d 432, to advance its position that reasonable suspicion is not required to search a probationer subject to a warrantless search condition. In Tessier, the United States Court of Appeals for the Sixth Circuit held that the search of the home of a Tennessee probationer who was subject to a warrantless search condition was constitutional under the totality of the circumstances and absent reasonable suspicion. 814 F.3d at 433-35. The defendant was subject to the same warrantless search condition as Angela Hamm, which the Sixth Circuit described as a "'standard' search condition that applies to all probationers in Tennessee." Id. at 433. The court held that, due to the existence of this "standard" condition and its conclusion that the search served legitimate law enforcement and/or probationary purposes, the search was constitutional. Id. at 432-35.

We find Tessier distinguishable because the warrantless search condition to which Angela Hamm was subject was not a "standard" provision to which all probationers in Tennessee are subject. Our state legislature has not expressly authorized warrantless searches as a condition of probation. See T.C.A. § 40-35-303(d) (listing conditions of supervised probation that a trial court may require of a defendant). While the conditions listed in section 40-35-303(d) are not exhaustive, there is not a uniform warrantless search provision to which every probationer in Tennessee is subject. Moreover, the evidence presented at the suppression hearing established that three different warrantless search provisions are used by probation officers in that district alone.[2] It appears that the language of a warrantless search provision differs according to the office, division, or entity supervising the probationer.

---

[2] While one of the warrantless search provisions presented during the hearing was utilized by a private probation service which provides supervision for the community corrections program, a defendant may be sentenced to probation to be supervised under the community corrections program. See State v. Christopher Schurman, No. M2011-01460-CCA-R3-CD, 2012 WL 1657057, at *2 (Tenn. Crim. App. May 10, 2012) (discussing probation supervised by community corrections).

- 13 -

**III. Consent.** It is unnecessary to resolve the State's remaining issues concerning common authority and whether Angela Hamm consented to the search of her home by agreeing to the warrantless search provision as a condition of her probation because we have concluded that the search of Hamm's house was not supported by reasonable suspicion.

## CONCLUSION

Based on a thorough review of the record, we affirm the trial court's ruling suppressing the evidence and dismissing the indictment as to both Defendants.

_____

CAMILLE R. MCMULLEN, JUDGE